IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH MR_CHARLESESCOTT@YAHOO.COM THAT IS STORED AT PREMISES CONTROLLED BY YAHOO HOLDINGS, INC. | Misc No. _____ <br><br> **UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Michael I. Jones, first being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo Holdings, Inc. ("Yahoo"), an e-mail provider headquartered at 701 First Avenue, Sunnyvale, California 94089. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2. I am a Special Agent with the District of Columbia Office of the Inspector General ("DC-OIG"). I am an investigative or law enforcement officer of the District of Columbia within the meaning of D.C. Code § 1-301.115a and Title 18 United States Code § 2501(7); that is, an officer of the District of Columbia who is empowered by law to conduct investigations of, and

make arrests for, offenses enumerated in the United States Code and D.C. Code. I am assigned to the Investigations Division of the DC-OIG. I am responsible for investigating fraud, waste, mismanagement and abuse of District of Columbia government resources, in addition to criminal violations that arise as a result of my investigations. I have been so employed with DC-OIG since January 2014. I am a graduate of the University of Maryland, with a Bachelor of Science degree in Criminology/Criminal Justice, and of the American Military University, an entity of the American Public University System, with a master's degree in Criminal Justice. I am also a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program. Prior to joining DC-OIG, I served for four years as a special agent with the United States Department of State, Bureau of Diplomatic Security. During that time, I conducted numerous investigations including, but not limited to, fraud against the United States, and assisted with probable cause searches and arrests applicable to violations of United States, District of Columbia, state and local laws.

3. The facts and information contained in this affidavit are based on my personal knowledge and observations, my review of records and documents obtained during this investigation, information received from other individuals, including witnesses and members of other law enforcement agencies, and my experience and training as a special agent.

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 371 (Conspiracy), and 1028A (Aggravated Identity Theft) have been committed by Charles Scott and others known and unknown to the government. There is also probable cause to

search the information described in Attachment A for evidence, fruits, and instrumentalities of these crimes, as described in Attachment B.

## JURISDICTION

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated," 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. See 18 U.S.C. § 3237.

7. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## BACKGROUND OF INVESTIGATION INTO CHARLES SCOTT AND DCPS COMPENSATORY EDUDCATION PROGRAM

8. The District of Columbia Public Schools ("DCPS") is a component of the District of Columbia government and its offices are located in the District of Columbia. The Office of Special Education ("OSE") operated within DCPS. The goal of OSE was to provide high-quality inclusion and special education services as well as to improve academic outcomes for students with disabilities.

9. Among other things, the OSE managed and oversaw the DCPS Compensatory Education ("Comp. Ed.") Program. The Comp. Ed. Program awarded services to eligible students to assist with their educational needs and development. Students awarded Comp. Ed. services had learning, mental, and/or behavioral disabilities that created an educational barrier that prevented the student from reaping the full benefit of his/her education. Comp. Ed. services consisted of tutoring, individualized education, mentoring, speech therapy, occupational therapy, and

behavioral and psychological analysis. Once DCPS deemed it appropriate for a student to receive Comp. Ed. services, it sent a notification letter to the student's parent or guardian specifying the Comp. Ed. services awarded to their child ("Comp. Ed. Letter"). The parent or guardian was responsible for identifying an independent provider to perform the services described in the Comp. Ed. Letter. The OSE provided a list of vendors. The services were typically performed outside of school, and after school hours.

10. DCPS Compliance Case Managers ("CCMs") had access to DCPS students' Hearing Officer Determination ("HOD"), Settlement Agreements, and Individualized Education Plans ("IEPs"). Additionally, CCMs ensured that DCPS fully implemented a student's HOD, Settlement Agreement, and/or IEP. A CCM also ensured that parents of DCPS students who received Comp. Ed. services were aware of their award and how to obtain the services of independent providers for their child.

11. In order to obtain payment, a service provider was required to submit two documents to the District of Columbia government: (1) a timesheet reflecting the name of the child for whom services were performed, the name of the tutor/mentor who performed the services, the number of hours worked, the signature of the parent/guardian, and the signature of the tutor; and (2) an invoice reflecting the total amount due from one or more timesheets for which the service provider sought payment. In addition, a copy of the Comp. Ed. Letter for the student receiving services was required to be included along with one of a vendor's initial invoices for services provided to that student.

12. DCPS records indicate that in or around November 2012, Scott became eligible to be paid as a vendor for the District of Columbia government. Scott submitted invoices to DCPS between October 2012 and December 2013, for purported services rendered to DCPS students

from June 2012 to November 2013. Corresponding check payments were mailed to Scott between November 2012 and November 2013 from offices of the District of Columbia government located in the District of Columbia.

## PROBABLE CAUSE

13. An investigation conducted by DC-OIG and the Federal Bureau of Investigation has revealed that Scott and others known and unknown to the government engaged in a scheme to defraud the Comp. Ed. program. Specifically, the investigation has revealed instances in which Scott submitted timesheets and invoices to DCPS for services that were never performed.

14. Invoices submitted to DCPS by Scott, some of which are described in more detail below, listed Scott's addresses as 10386 Faulkner Ridge Circle, Columbia, MD 21044 and P.O. Box 70076, Baltimore, MD 21203. Invoices also list Scott's email address as MR_CHARLESESCOTT@YAHOO.COM (the "Subject Account"). Timesheets identified Scott as the supervisor of the mentor/tutor listed on each invoice.

15. During the course of the investigation, your affiant requested and obtained a copy of Scott's vendor profile from the D.C. Office of the Chief Financial Officer. Scott's vendor profile identified 10386 Faulkner Ridge Circle, Columbia, MD 21044 as Scott's address of record. All payments issued to Scott form the D.C. government were mailed to Scott's address of record.

16. On July 17, 2017, this Court issued a search warrant for certain information associated with the account SONOFTONYA@YAHOO.COM. This account is believed to be used by Isaiah Johnson, a former CCM. Among the emails obtained through this search warrant was an October 3, 2012, email from SONOFTONYA@YAHOO.COM to the Subject Account. Attached to the email was an invoice from Scott to DCPS for 21 hours of tutoring services purportedly provided to DCPS student Child A.

5

17.     On March 10, 2014, your affiant interviewed Parent A, the parent of Child A.  Also present for the interview was Child A.  During the course of the interview, Parent A stated that Parent A was never aware that DCPS deemed Child A eligible for paid educational services.  Parent A was provided with copies of timesheets Scott submitted to DCPS in support of an invoice for services purportedly performed in August and September 2012 ("Scott Timesheets").  The Scott Timesheets indicated that Scott provided mentoring/counseling and tutoring services to Child A.  In total, the Scott Timesheets indicated that Child A received fifteen hours of counseling/mentoring and 18.5 hours of tutoring services.  Child A advised your affiant that Scott only provided mentoring services and never tutored Child A and that these mentoring services were only provided on Saturdays.

18.     A review of the Scott Timesheets by your affiant revealed that Scott purported to provide mentoring/counseling and tutoring services to Child A on weekdays (August 16, 2012; August 21, 2012; September 4, 2012; September 6, 2012; September 11, 2012; September 13, 2012; and September 18, 2012).

19.     Scott submitted invoices to DCPS for services purportedly performed for a number of other DCPS students.  Investigators interviewed eleven students and/or their parents/guardians for whom Scott had sought payment from DCPS for educational services he claimed were performed.  Of these eleven, nine students and/or their parents/guardians informed investigators that neither Scott nor anyone acting on his behalf had provided any services.

20.     For example, on March 7, 2014, your affiant interviewed Parent B, the parent of Child B, a DCPS student. During the course of the interview, your affiant showed Parent B copies of timesheets submitted by Scott for services purportedly rendered to Child B.  These timesheets indicated that Person A and Person B provided services to Child B pursuant to a Comp. Ed. Letter.

The Comp. Ed. Letter was dated May 17, 2013, and was issued and signed by a CCM. The dates of services listed on the Scott timesheets were between May 20, 2013, and October 9, 2013. In total, the timesheets indicated that Child B received 80 hours of mentoring services and 100 hours of tutoring services. Parent B told your affiant that Child B did not receive any services from Person A or Person B.

21. Scott submitted invoices to DCPS dated August 19, 2013, and October 8, 2013, relating to services purportedly rendered to Child B. The invoices were received by the District of Columbia's Office of the Chief Financial Officer on August 20, 2013, and October 11, 2013, respectively. In payment of these and other invoices, DCPS mailed District of Columbia government check #5634093 to Scott on September 16, 2013, in the amount of $14,765 and check #5659644 on November 15, 2013, in the amount of $13,002.50.

## BACKGROUND CONCERNING EMAIL

22. In my training and experience, I have learned that Yahoo provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Yahoo. During the registration process, Yahoo asks subscribers to provide basic personal information. Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

23.     A Yahoo subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

24.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often nevertheless provides clues to their identity, location, or illicit activities.

25.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP

address information can help to identify which computers or other devices were used to access the e-mail account.

26. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

27. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, email providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of

the email account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

28. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo Holdings, Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Michael I. Jones
Special Agent
Office of the Inspector General
Government of the District of Columbia

Subscribed to and sworn to before me this \_\_\_\_\_ day of November, 2017

_____
HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with MR_CHARLESESCOTT@YAHOO.COM, that is stored at premises controlled by Yahoo Holdings, Inc., a company that accepts legal service at 701 First Avenue, Sunnyvale, California 94089

**ATTACHMENT B**

**Particular Information to be Seized**

I.  **Information to be disclosed by Yahoo Holdings, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, webpages, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. The contents of all emails associated with the account, from January 1, 2012, to April 1, 2014, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails;

b. The contents of all chat messages and logs associated with the accounts, including stored chat messages and logs;

c. The contents of all SMS messages and logs associated with the accounts, including stored SMS messages and logs;

d. The files and contents associated with the accounts related to Yahoo services such as, but not limited to: Yahoo Groups, Yahoo Messenger, Yahoo Briefcase, Yahoo search history, Yahoo Profile, Yahoo Sites, Yahoo voice and voicemail and Yahoo photos;

e. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

  f.  The types of service used;

  g.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

  h.  All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

I. **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and/or instrumentalities of violations of Title 18, United States Code, Sections, 1341 (Mail Fraud), 666 (Theft of Public Money, Property or Records), 201 (Bribery), 371 (Conspiracy), and 1028A (Aggravated Identity Theft) including for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Records and information relating to person(s) who created, used or communicated using the account in Attachment A, including records about their identities and whereabouts;

(b) Communications with Isaiah Johnson;

(c) Communications with any employee or agent of Charles Scott;

(d) Communications with any individual or entity related to the District of Columbia Public Schools ("DCPS");

(e) Records and information regarding Compensatory Education Services such as timesheets, invoices and/or payment requests;

(f) Communications with any DCPS vendor and/or individual that provided and/or billed for Compensatory Education Services;

(g) Communications with any parent/guardian or students for whom DCPS was invoiced for services by Charles Scott;

(h) Records and information relating to communications regarding Compensatory Education Letters or Individualized Educational Plans;

(i) Records and information relating to communications regarding prospective employment as a tutor, mentor, or any other position, for any person with Charles Scott;

(j) Disposition of proceeds from the illegal activity;

(k) Steps taken in furtherance of the scheme;

(l) Any and all evidence indicating in any way a motive to engage in criminal activity, such as receiving money or gifts in exchange for the names of DCPS students eligible for the Compensatory Education program;

(m) Financial records and documents relating to assets or accounts accessed by Charles Scott or others engaged in criminal conduct;

(n) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner; and

(o) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

**III.     Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

# **CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Yahoo Holdings, Inc., and my official title is _____.  I am a custodian of records for Yahoo Holdings, Inc.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Yahoo Holdings, Inc. and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of Yahoo Holdings, Inc., and

    c.    such records were made by Yahoo Holdings, Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____      _____
Date                                                     Signature